# Exhibit "1"

**McDonnell Crowley, LLC**
115 Maple Avenue
Red Bank, NJ 07701
(732) 383-7233
bcrowley@mchfirm.com
Brian T. Crowley
*Counsel for John M. McDonnell,*
*Chapter 7 Trustee/Plaintiff*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>ELIA J. ZOIS and MARIANA ZOIS,<br><br>Debtors. | Case No. 19-12556 (KCF)<br><br>Honorable Kathryn C. Ferguson<br><br>Chapter 7 |
| JOHN M. MCDONNELL, AS CHAPTER 7 TRUSTEE,<br><br>Plaintiff,<br><br>v.<br><br>ELIA J. ZOIS and MARIANA ZOIS<br><br>Defendants. | Adv. Pro. No. 19-_____ (KCF) |

### COMPLAINT TO DETERMINE
### AND TO OBJECT TO DEBTORS' DISCHARGE

John M. McDonnell, the chapter 7 trustee (the "Plaintiff" or the "Trustee"), by and through his undersigned counsel, McDonnell Crowley, LLC, by way of a Complaint against Elia J. Zois ("Elia") and Mariana Zois ("Mariana" and together with Elia the "Defendants" or the "Debtors"), the chapter 7 debtors, hereby alleges, based upon information and belief, as follows:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334 (b), 28 U.S.C. §157(a) and (b)(1).

2.    Venue is properly fixed in this Court pursuant to 28 U.S.C. §1409.

3.    This is a core proceeding that may be heard and determined by a bankruptcy judge pursuant to 28 U.S.C. §157(b)(2)(A), (B), (I), and (J).

4.    This is an adversary proceeding to object to the Defendants' discharge pursuant to 11 U.S.C. §727.

## PARTIES

5.    The Defendants are the debtors in the within chapter 7 proceeding, with an address at 88 Montrose Road, Colts Neck, New Jersey 07722.

6.    The Plaintiff is the appointed chapter 7 trustee in the Defendants' chapter 7 proceeding.

## BACKGROUND

**Procedural Background**

7.    On February 6, 2019 (the "Petition Date"), the Debtors filed their joint voluntary petition (the "Petition") for relief under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey. *See* Court Docket in *In re Elia J. Zois and Mariana Zois,* Case No. 19-12556 (KCF) (the "Main Case Docket"), No. 1.

8.    On February 7, 2019, John M. McDonnell, Esq. was appointed the Trustee for the Debtors, has duly qualified and is acting in that capacity. *See* Main Case Docket No. 3.

9.      The Debtors' 341(a) meeting (the "341 Meeting") of creditors was held on March 15, 2019.  *See* Main Case Docket *generally*.

10.      The original deadline to object to the Debtors' discharge was May 13, 2019.  *See* Main Case Docket *generally*.

11.      On May 13, 2019, given various outstanding issues, the Trustee filed his motion to extend the deadline for the Trustee and/or the United States Trustee to object to the Debtors' discharge to and including August 13, 2019 (the "Motion to Extend").  *See* Main Case Docket No. 34.

12.      Based upon information and belief, the Debtors threatened to file an objection to the Motion to Extend and severely limit the extension time and possibly allow for no extension.

13.      On June 14, 2019, this Court entered a consent order (the "Consent Order") between the Trustee and the Debtors extending the deadline for the Trustee and/or the United States Trustee to object to the Debtors' discharge to and including August 2, 2019.  *See* Main Case Docket No.  48.

14.      Based upon the terms of the Consent Order the deadline to file the within Complaint is August 2, 2019.  *See* Main Case Docket No.  48.

**The Debtors have Failed to Cooperate with the Trustee and appear to have Engaged in Transfers to Insiders and Third Parties**

15.      Based upon information and belief, despite the Debtors continuing to live a luxurious lifestyle, including private school for their children, and living in a mansion that is better described as a compound something out of the old T.V. show Dynasty – the Debtors claim to have no income at all and no real assets – not even furniture for the mansion they reside.

16.      Rather, the Debtors claim they are supported by Elia's father, Christ Zois (the "Debtor's Father").  However, it appears the Debtors have been using at least one undisclosed

bank account held in the name of a further undisclosed company owed by Elia, Mind Gamz, LLC ("Mind Gamz"), to support not only the Debtors' luxury lifestyle but that of Elia's parents, including the Debtor's Father.

17.     Based upon the limited books and records available to the Trustee's accountants, Bederson LLP ("Bederson"), prepared a *preliminary report* (the "Bederson Report") that shows various potential transfers to insiders and third parties, and undisclosed/under-disclosed assets. Attached hereto as **Exhibit "A"** is a copy of the Bederson Report.

18.     As noted more fully below, the Bederson Report highlights the various inconsistencies found in the Petition and the Debtors' testimony at the 341 Meeting.

19.     Based upon information and belief, Elia is the owner and sole member of Mind Gamz.  Mind Gams appears to have been registered at certain real property at 870 South Ocean Blvd., Palm Beach, Florida 33480 (the "Palm Beach Estate") that the Debtors seem to have sold last year for approximately $8,500,000.  The sale of the Palm Beach Estate does not appear to be reflected anywhere in the Debtors' Petition.  Attached hereto as **Exhibit "B"** is a recent article related to the sale.

20.     Based upon further information and belief, the Debtors funneled income and payments due the Debtors (specifically Elia) to the bank account(s) of Mind Gamz, and used the funds for largely personal use and to make significant transfers to insiders and/or third parties. The Debtors appear to have done all this while the Internal Revenue Service (the "IRS") held a lien on the Debtors' personal bank accounts since 2014 and/or to otherwise shelter assets from the estates' creditors.

21.     The Mind Gamz account(s) appear to reflect activity in almost the entire four (4) year period prior to the Petition Date and the account(s) continued to have post-petition receipts

and disbursements in significant amounts despite the Debtors' assertion that they had no source

of income.

22.    Based upon information and belief, many of the transfers to the Debtors appear to

have been made by another company Elia has/had an ownership interest in KBWB Operations,

LLC ("KBWB") and Atrium Health Group.    Attached hereto as **Exhibit "C"** is a recent article

about Atrium titled "FBI agents, other feds descend on two N.J. rehab facilities as company plans to

acquire them".

23.    Both KBWB and Mind Gamz appear to share the same banking institution, Valley

National Bank ("Valley Bank"), and at times the same mailing address in Wayne and Little Falls,

New Jersey.  Most of the deposits (in the form of wire transfers) to the undisclosed Mind Gamz

account(s) were made payable directly to Elia and not Mind Gamz.  However, Valley Bank

appears to have cashed checks and/or deposited wire transfers made payable to Elia directly into

the Mind Gamz accounts.

24.    As noted in the Bederson Report and more fully below, these transfers,

undisclosed/under-disclosed assets include the following actively through the Mind Gamz

account(s) in the four (4) years prior to the Petition Date and post-petition:

- Approximately $2,900,000 in deposits during the four (4) year period prior to the Petition Date.

- Over $200,000 in post-petition deposits.

- Approximately $2,800,000 in possible insider transfers and other significant disbursements during the during the four (4) year period prior to the Petition Date.

- Approximately $190,000 in post-petition transfers.

*See* the Bederson Report at Exhibit "A".

25.    All this as the Debtors claim essentially poverty and no assets and hundreds of millions of dollars of debt.

26.    The Debtors list 88 Montrose Road, Colts Neck, New Jersey 07722 (the "Colts Neck Estate") as their current address.  Based upon information and belief, the Debtors claim they no longer reside at the Colts Neck Estate as the Debtor's Father could not afford the rent. However, no change of address has been filed by the Debtors. *See* Main Case Docket *generally*.

27.    A recent internet search appears value the Colts Neck Estate as being worth approximately $9 million and with a possible monthly rental of $10,000.  The Colts Neck Estate is described as follows "[w]elcome to one of New Jersey's Finest Estates. 'Windy Hill' This 38 acre private estate, overlooks a private lake while bordering Bucks Mill park.  The Estate was designed by Cathy Zukerman and built by Jim Lukowitz as culmination of the sellers desire to create a French Chateau which embodies old world character and charm while offering the highest level of quality, modern conveniences and attention to detail.  From its full stone facade to its staggered slate roof and French Roasted Oak Floors, the attention to detail is evident in the fine details in each and every room. 7 bedrooms 10 plus bathrooms[.]  This property comes with a grounds keeper to maintain the live stock and grounds.  ***Luxury Estate Living at its finest.***"[1] Attached hereto as **Exhibit "D"** are some photos of the Colts Neck Estate and information regarding the same.

28.    The Trustee will continue to pursue the turnover of additional information and expects to find additional information as to transfers to insiders and/or third parties, and/or undisclosed/under-disclosed assets and will amend his pleadings accordingly.   However, the Trustee was under a deadline due to the terms of the Consent Order to file this Complaint as the

---

[1] https://www.realtor.com/realestateandhomes-detail/88-Montrose-Rd_Colts-Neck_NJ_07722_M66512-37988#photo72; and https://www.movoto.com/realestate/88-montrose-rd-colts-neck-nj-07722-pid_3jrjlc10ih.

Debtors only initially agreed to a limited extension of the deadline to object to the Debtors'

discharge and the Trustee and his professionals had a very limited time to digest voluminous

documents and information to timely file this Complaint. The Trustee also expects to find

additional information and/or documents that will potentially result in additional claims against

the Debtors, insiders, and/or third parties.

**The Questions and Inconsistencies of the Debtors' Petition**

29.     The Debtor lists almost no assets on the Petition yet hundreds of millions of

dollars in debt. On Schedule "A/B" of the Debtors' Petition, the Debtors list approximately

$9,000 in assets and over $207 million in liabilities on Schedules "E" and "F" along with various

creditors owed unknown amounts. *See* Main Case Docket No. 1.

- Trustee's Response: Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.

30.     In response to Question No. 6 on Schedule "A/B" of the Petition that requires the

Debtors to disclose the Debtors' ownership interest in "Household goods and furnishings" - the

Debtors answer is to list "Miscellaneous household furnishings" with a designated value of

"$3,000". *See* Main Case Docket No. 1.

- Trustee's Response: Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report. By way of example, the Debtors appear to have made approximately $600,000 in credit card payments in the four (4) years prior to the Petition Date through the Mind Gamz account(s).

31.     In response to Question No. 7 on Schedule "A/B" of the Petition that requires the

Debtors to disclose the Debtors' ownership interest in "Electronics" - the Debtors answer is to

list "Miscellaneous Electronics" with a designated value of "$1,500". *See* Main Case Docket

No. 1.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, the Debtors appear to have made approximately $600,000 in credit card payments in the four (4) years prior to the Petition Date through the Mind Gamz account(s).

32.     In response to Question No. 8 on Schedule "A/B" of the Petition that requires the

Debtors to disclose the Debtors' ownership interest in "Collectibles of value" - the Debtors

answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, the Debtors appear to have made approximately $600,000 in credit card payments in the four (4) years prior to the Petition Date through the Mind Gamz account(s). Moreover, there appears to be deposits from consignment vendors for the sale of items including rare books.

33.     In response to Question No. 9 on Schedule "A/B" of the Petition that requires the

Debtors to disclose the Debtors' ownership interest in "Equipment for sports and hobbies" - the

Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, the Debtors appear to have made approximately $600,000 in credit card payments in the four (4) years prior to the Petition Date through the Mind Gamz account(s).

34.     In response to Question No. 11 on Schedule "A/B" of the Petition that requires

the Debtors to disclose the Debtors' ownership interest in "Clothes" - the Debtors answer is to

list "Miscellaneous wearing apparel" with a designated value of "$2,000".  *See* Main Case

Docket No. 1.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, the Debtors appear to have made approximately $600,000 in credit card payments in the four (4) years prior to the Petition Date through the Mind Gamz account(s).

35.    In response to Question No. 12 on Schedule "A/B" of the Petition that requires

the Debtors to disclose the Debtors' ownership interest in "Jewelry" - the Debtors answer is to

list "Miscellaneous Jewelry" with a designated value of "$1,000". *See* Main Case Docket No. 1.

- Trustee's Response:  Based upon information and belief and as noted in the
  Bederson Report this answer by the Debtors appears inconsistent with the
  information with the facts and the Bederson Report.  By way of example, the
  Debtors appear to have made approximately $600,000 in credit card payments in
  the four (4) years prior to the Petition Date through the Mind Gamz account(s).

36.    In response to Question No. 16 on Schedule "A/B" of the Petition that requires

the Debtors to disclose the Debtors' ownership interest in "Cash" - the Debtors answer is to list

"Cash on hand" with a designated value of "$200". *See* Main Case Docket No. 1.

- Trustee's Response:  Based upon information and belief and as noted in the
  Bederson Report this answer by the Debtors appears inconsistent with the
  information with the facts and the Bederson Report.  By way of example, there
  were approximately $25,000 in cash payments made from the Mind Gamz
  account(s) and about $800,000 transferred to Elia and about $24,000 in payments
  made to Mariana by way of the Mind Gamz accounts.

37.    In response to Question No. 17 on Schedule "A/B" of the Petition that requires

the Debtors to disclose the Debtors' ownership interest in "Deposits of money" - the Debtors

answer is to list four (4) bank account statements with Bank of America and one account with

Wells Fargo with an aggregate amount of less than $800 in all the accounts.  *See* Main Case

Docket No. 1.

- Trustee's Response:  Based upon information and belief and as noted in the
  Bederson Report this answer by the Debtors appears inconsistent with the
  information with the facts and the Bederson Report.  By way of example, there
  were approximately $25,000 in cash payments made from the Mind Gamz
  account(s) and about $800,000 transferred to Elia and about $24,000 in payments
  made to Mariana by way of the Mind Gamz accounts.  Additionally, the Mind
  Gamz account(s) at Valley Bank are not listed and the Debtors appear to have
  PayPaal and Venmo accounts that are not listed on the Petition.

9

38.    In response to Question No. 18 on Schedule "A/B" of the Petition that requires the Debtors to disclose the Debtors' ownership interest in "Bonds, mutual funds, or publicly traded stocks" - the Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, there was approximately $73,000 transferred to Charles Schwab and the Petition did not list any investments accounts at Charles Schwab.

39.    In response to Question No. 19 on Schedule "A/B" of the Petition that requires the Debtors to disclose the Debtors' ownership interest in "Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture" - the Debtors answer is to list a "20% Membership Interest" in "KBWB Operations, LLC[] and Subsidiaries 1120 Alps Road Wayne NJ 07470" with an "Unknown" value. *See* Main Case Docket No. 1.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, Mind Gamz is not listed nor is Atrium Health Group.  As to the value of KBWB this appears inconsistent with vast and large payments made to Mind Gamz by KBWB.

40.    In response to Question No. 20 on Schedule "A/B" of the Petition that requires the Debtors to disclose the Debtors' ownership interest in "Government and corporate bonds and other negotiable and non-negotiable instruments" - the Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, there was approximately $73,000 transferred to Charles Schwab.

41.    In response to Question No. 21 on Schedule "A/B" of the Petition that requires

the Debtors to disclose the Debtors' ownership interest in "Retirement or pension accounts" - the

Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- Trustee's Response:    Based upon information and belief and as noted in the
  Bederson Report this answer by the Debtors appears inconsistent with the
  information with the facts and the Bederson Report.    By way of example, there
  was approximately $73,000 transferred to Charles Schwab.

42.    In response to Question No. 22 on Schedule "A/B" of the Petition that requires

the Debtors to disclose the Debtors' ownership interest in "Security deposits and prepayments" -

the Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- Trustee's Response:    Based upon information and belief and as noted in the
  Bederson Report this answer by the Debtors appears inconsistent with the
  information with the facts and the Bederson Report.    By way of example, there
  appears to be numerous payments paid to realtors and commercial and/or
  residential management companies and the Debtors reside in a multi-million
  dollar compound (*i.e.*, the Colts Neck Estate).

43.    In response to Question No. 23 on Schedule "A/B" of the Petition that requires

the Debtors to disclose the Debtors' ownership interest in "Annuities" - the Debtors answer "No"

thus, confirming no such asset. *See* Main Case Docket No. 1.

- Trustee's Response:    Based upon information and belief and as noted in the
  Bederson Report this answer by the Debtors appears inconsistent with the
  information with the facts and the Bederson Report.    By way of example, there
  was approximately $73,000 transferred to Charles Schwab.    In addition, Mind
  Gamz paid $45,000 to Lincoln National Life Insurance, $34,000 to Prudential
  Insurance, and $8,000 to TransAmerica Insurance.

44.    In response to Question No. 24 on Schedule "A/B" of the Petition that requires

the Debtors to disclose the Debtors' ownership interest in "Interests in an education IRA, in an

account in a qualified ABLE program, or under a qualified state tuition program" - the Debtors

answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- <u>Trustee's Response</u>:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.   By way of example, there was approximately $73,000 transferred to Charles Schwab.

45.     In response to Question No. 26 on Schedule "A/B" of the Petition that requires the Debtors to disclose the Debtors' ownership interest in "Patents, copyrights, trademarks, trade secrets, and other intellectual property" - the Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- <u>Trustee's Response</u>:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  Additionally, Elia appears to have been the director and co-writer (along with the Debtor's Father) for the 2003 movie "Jersey Guy".   It seems unlikely there are no interests in copyright material.[2]

46.     In response to Question No. 27 on Schedule "A/B" of the Petition that requires the Debtors to disclose the Debtors' ownership interest in "Licenses, franchises, and other general intangibles" - the Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- <u>Trustee's Response</u>:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.

47.     In response to Question No. 30 on Schedule "A/B" of the Petition that requires the Debtors to disclose the Debtors' ownership interest in "Other amounts someone owes you" - the Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- <u>Trustee's Response</u>:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.

---

[2] *See* https://www.imdb.com/title/tt0191211/?ref_=nm_knf_t1

48.     In response to Question No. 31 on Schedule "A/B" of the Petition that requires

the Debtors to disclose the Debtors' ownership interest in "Interests in insurance policies" - the

Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- • Trustee's Response:    Based upon information and belief and as noted in the
  Bederson Report this answer by the Debtors appears inconsistent with the
  information with the facts and the Bederson Report.    Specifically, Mind Gamz
  made the following approximate payments: $45,000 to Lincoln National Life
  Insurance, $34,000 to Prudential Insurance, and $8,000 to TransAmerica
  Insurance.

49.     In response to Question No. 33 on Schedule "A/B" of the Petition that requires

the Debtors to disclose the Debtors' ownership interest in "Claims against third parties, whether

or not you have filed a lawsuit or made a demand for payment" - the Debtors answer "No" thus,

confirming no such asset. *See* Main Case Docket No. 1.

- • Trustee's Response:    Based upon information and belief and as noted in the
  Bederson Report this answer by the Debtors appears inconsistent with the
  information with the facts and the Bederson Report.

50.     In response to Question No. 34 on Schedule "A/B" of the Petition that requires

the Debtors to disclose the Debtors' ownership interest in "Other contingent and unliquidated

claims of every nature, including counterclaims of the debtor and rights to set off claims" - the

Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- • Trustee's Response:    Based upon information and belief and as noted in the
  Bederson Report this answer by the Debtors appears inconsistent with the
  information with the facts and the Bederson Report.

51.     In response to Question No. 35 on Schedule "A/B" of the Petition that requires

the Debtors to disclose the Debtors' ownership interest in "Any financial assets you did not

already list" - the Debtors answer "No" thus, confirming no such asset. *See* Docket No. 1.

- • Trustee's Response:    Based upon information and belief and as noted in the
  Bederson Report this answer by the Debtors appears inconsistent with the
  information with the facts and the Bederson Report. Specifically, the Debtors did

not disclose their interest in Mind Gamz, which received approximately $2,900,000 in funds that mostly appear to have been owed to Elia but were transferred and/or diverted to Mind Gamz.

52.    In response to Question No. 37 on Schedule "A/B" of the Petition that requires the Debtors to answer the following question "Do you own or have any legal or equitable interest in any business-related property?" - the Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- Trustee's Response:   Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.   Specifically, the Debtors did not disclose their interest in Mind Gamz, which received approximately $2,900,000 in funds that mostly appear to have been owed to Elia but were transferred and/or diverted to Mind Gamz.

53.    In response to Question No. 46 on Schedule "A/B" of the Petition that requires the Debtors to answer the following question "Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?" - the Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- Trustee's Response:   Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.   Additionally, the Debtors' appears to reside at the Colts Neck Estate, which is advertised, among other things, as a property that "comes with a grounds keeper to maintain the live stock and grounds."

54.    In response to Question No. 53 on Schedule "A/B" of the Petition that requires the Debtors to answer the following question "Do you have other property of any kind you did not already list?" - the Debtors answer "No" thus, confirming no such asset. *See* Main Case Docket No. 1.

- Trustee's Response:   Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.   Specifically, the Debtors did not disclose their interest in Mind Gamz, which received approximately

$2,900,000 in funds that mostly appear to have been owed to Elia but were transferred and/or diverted to Mind Gamz.

55.    The Debtors list no secured creditors on Schedule "D" of the Petition.  *See* Main Case Docket No. 1.

56.    The Debtors list only list the State of New Jersey as having a general unsecured priority claim on Schedule "E" of the Petition in the amount of $4,572.61.  *See* Main Case Docket No. 1.

57.    Among the creditors listed on Schedule "F" of the Debtors' petition are American Express Centurion Bank and Citicard.  Both of these creditors and/or their corporate affiliates appear to have each filed proofs of claim in these proceedings.  *See* Main Case Docket No. 1 and Proofs of Claim Nos. 5 and 9.

- Trustee's Response:  Based upon information and belief and as partially noted in the Bederson Report:

  - There is currently $184,551,922.85 in claims filed against the Debtors.  *See* Claims Register *generally*.

  - The IRS filed a claim in the total amount of $1,818,113.42.  The claim filed by the IRS included a secured portion of $9,033.67 and a priority portion of $10,735.36. *See* Proof of Claim No. 2.

  - The State of New Jersey filed a claim in the total amount of $379,916.25.  The claim filed by the State of New Jersey included a secured portion of $364,791.69 and a priority portion of $5,000. *See* Proof of Claim No. 7.

  - As noted below, at the Debtors' 341 Meeting they claimed to have no credit cards.

58.    The Debtors list no executory contracts and unexpired leases on Schedule "G". *See* Main Case Docket No. 1.

- Trustee's Response:  One would assume that if the Debtors reside at the Colts Neck Estate they would be signatories to a lease.

15

59.     On Schedule "I" of the Petition the Debtors listed both of themselves as being "Not employed" with "$0.00" or absolutely monthly no income. *See* Main Case Docket No. 16.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  Specifically, the Debtors did not disclose their interest in Mind Gamz that received approximately $2,900,000 due that appears was largely due to Elia but transferred to Mind Gamz.

60.     In response to Question No. 3 on Schedule "J" of the Petition the Debtors answer "No" to the following "Do your expenses include expenses of people other than yourself and your dependents?"  *See* Main Case Docket No. 16.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  Specifically, the Debtors the Debtors appear to have made regular transfers to or for the benefit of insiders and/or third parties.

61.     On Schedule "J" of the Petition the Debtors list just $1,150 in total monthly expenses thus, resulting in negative monthly income of $1,150.  The only itemized expenses are for the following line items: "Food and housekeeping supplies", "Clothing, laundry, and dry cleaning", "Transportation", "Personal care products and services", and "Personal care products and services".  The Debtors list $0.00 for "Childcare and children's education costs".  *See* Main Case Docket No. 16.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, the Debtors appear to have made approximately $600,000 in just credit card payments in the four (4) years prior to the Petition Date through the Mind Gamz account(s); and Mind Gamz paid St. Luke's (the private school where the Debtors' two children attend) approximately $71,000 in just 2017 and 2018, and about $10,000 paid post-petition.

62.     In response to Question No. 2 of the Statement of Affairs (the "SOFA") that asks the Debtors to list the previous places the Debtors have lived in the past three (3) years the

Debtors list the following address "2118 Allenwood Road Wall, NJ 07719" (the "Wall Property"). The Debtors' claim to have left the Wall Property in December 2018." *See* Main Case Docket No. 16.

- Trustee's Response:  Based upon information and belief, despite having claimed to have left the Wall Property in December 2018, the recent bank statement of Mind Gamz still appear to reflect the Wall Property as the current address for Mind Gamz.

63.    Question No. 4 of SOFA reads as follows:

**Did you have any income from employment or from operating a business during this year or the two previous calendar years?**
Fill in the total amount of income you received from all jobs and all businesses, including part-time activities.
If you are filing a joint case and you have income that you receive together, list it only once under Debtor 1.

64.    In response to Question No. 4 of the SOFA the Debtor answers "Yes" and proceed to list "$0.00" no zero income from 2017 through and including the Petition Date. *See* Main Case Docket No. 16.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, there were approximately $25,000 in cash payments made from the Mind Gamz accounts and about $800,000 in payments to Elia and about $24,000 in payments to Mariana by way of the Mind Gamz account(s).  Moreover, Mind Gamz received approximately $2 million from KBWB, an entity in which the Petition indicates the Debtor(s) own a 20% interest.  Several of the wire receipts provided by Valley Bank had memos indicating that the receipts were distributions.  This was within the four (4) years prior to the Petition Date.  Thus, some or all of the transfers (in the approximate amount of $2 million) from KBWB to Elia appear to be distributions/income.

65.    Question No. 5 of the SOFA reads as follows:

**Did you receive any other income during this year or the two previous calendar years?**
Include income regardless of whether that income is taxable. Examples of other income are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money

collected from lawsuits; royalties; and gambling and lottery winnings. If you are
filing a joint case and you have income that you received together, list it only
once under Debtor 1.

List each source and the gross income from each source separately. Do not
include income that you listed in line 4.

66.    In response to Question No. 5 of the SOFA the Debtor answers "No". *See* Main

Case Docket No. 16.

- Trustee's Response:   Based upon information and belief and as noted in the
  Bederson Report this answer by the Debtors appears inconsistent with the
  information with the facts and the Bederson Report.  By way of example, there
  were approximately $25,000 in cash payments made from the Mind Gamz
  accounts and about $800,000 in payments to Elia and about $24,000 in payments
  to Mariana by way of the Mind Gamz accounts.  Moreover, Mind Gamz received
  approximately $2 million from KBWB, an entity in which the Petition indicates
  the Debtors own a 20% interest.  Several of the wire receipts provided by Valley
  Bank had memos indicating that the receipts were distributions. This was within
  the four (4) years prior to the Petition Date.

67.    Question No. 7 of the SOFA reads as follows:

**Within 1 year before you filed for bankruptcy, did you make a payment on a
debt you owed anyone who was an insider?**
Insiders include your relatives; any general partners; relatives of any general
partners; partnerships of which you are a general partner; corporations of which
you are an officer, director, person in control, or owner of 20% or more of their
voting securities; and any managing agent, including one for a business you
operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic
support obligations, such as child support and alimony.

68.    In response to Question No. 7 of the SOFA the Debtor answers "No". *See* Main

Case Docket No. 16.

- Trustee's Response:   Based upon information and belief and as noted in the
  Bederson Report this answer by the Debtors appears inconsistent with the
  information with the facts and the Bederson Report.  By way of example,
  transfers from the Mind Gamz account(s) include the following approximate
  transfers to apparent insiders: $73,500 to Chris Zois, $165,500 to Christ Zois, and
  $12,500 to Joelle Zois.

69.    Question No. 8 of the SOFA reads as follows:

**Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?**
Include payments on debts guaranteed or cosigned by an insider

70. In response to Question No. 8 of the SOFA the Debtor answers "No". *See* Main

Case Docket No. 16.

- Trustee's Response: Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report. By way of example, transfers from the Mind Gamz account(s) include following the approximate transfers to apparent insiders: $73,500 to Chris Zois, $165,500 to Christ Zois, and $12,500 to Joelle Zois. Moreover, as the Debtors claim they live with the Debtor's Father it is also possible they were paying many of the daily living expenses of the Debtor's Father and the Debtor's mother.

71. More inconsistencies are reflected on the Debtors' Petition.

72. Question No. 13 of the SOFA reads as follows:

**Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?**

73. In response to Question No. 13 of the SOFA the Debtor answers "No". *See* Main

Case Docket No. 16.

- Trustee's Response: Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report. By way of example, transfers from the Mind Gamz account(s) include the following approximate transfers to apparent insiders: $73,500 to Chris Zois, $165,500 to Christ Zois, and $12,500 to Joelle Zois. Moreover, as the Debtors claim they live with the Debtor's Father it is also possible they were paying many of the daily living expenses of the Debtor's Father and the Debtor's mother. Furthermore, the Debtors did not disclose their interest in Mind Gamz that received approximately $2,900,000 that appears was largely due to Elia but transferred to Mind Gamz.

74. Question No. 14 of the SOFA reads as follows:

**Within 2 years before you filed for bankruptcy, did you give any gifts or contributions with a total value of more than $600 to any charity?**

75.     In response to Question No. 14 of the SOFA the Debtor answers "No". *See* Main

Case Docket No. 16.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, Mind Gamz paid St. Luke's (the private school where the Debtors' two children attend) approximately $71,000 in just 2017 and 2018, and about $10,000.  Additionally, an online search appears to reflect an article for St. Luke's school from the Summer of 2018 that lists the Debtors as donors to the school in the amounts of $1,000 - $2,499.[3]

76.     Question No. 17 of the SOFA reads as follows:

**Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone who promised to help you deal with your creditors or to make payments to your creditors?**
Do not include any payment or transfer that you listed on line 16.

77.     In response to Question No. 17 of the SOFA the Debtor answers "No". *See* Main

Case Docket No. 16.

- Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, Mind Gamz received approximately $2,900,000 that appears was mostly due to Elia but transferred to Mind Gamz where these funds appear to have been used to pay at least some of the Debtors' creditors.

78.     Question No. 18 of the SOFA reads as follows:

**Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?**
Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property). Do not include gifts and transfers that you have already listed on this statement.

79.     In response to Question No. 18 of the SOFA the Debtor answers "No". *See* Main

Case Docket No. 16.

---

[3] *See* https://www.stlukeschool.org/uploaded/redesign_2013/News_2013/Winged_Ox_2018_Summer.pdf.

- <u>Trustee's Response</u>: Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report. By way of example, transfers from the Mind Gamz account(s) include the following approximate transfers to apparent insiders: $73,500 to Chris Zois and $165,500 to Christ Zois, and $12,500 to Joelle Zois. Moreover, Mind Gamz received approximately $2,900,000 that appears was mostly due to Elia but transferred to Mind Gamz. Additionally, the sale of the Palm Beach Estate is also not reflected on the Debtors' Petition.

80.    Question No. 20 of the SOFA reads as follows:

**Within 1 year before you filed for bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?**
**Include checking, savings, money market, or other financial accounts; certificates of deposit; shares in banks, credit unions, brokerage houses, pension funds, cooperatives, associations, and other financial institutions.**

81.    In response to Question No. 20 of the SOFA the Debtor answers "No". *See* Main

Case Docket No. 16.

- <u>Trustee's Response</u>: Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report. By way of example, Mind Gamz received approximately $2,900,000 that appears was mostly due and payable (in the form of checks and/or wire transfers) to Elia.

82.    Question No. 27 of the SOFA reads as follows:

**Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?**
☐ **A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time**
☐ **A member of a limited liability company (LLC) or limited liability partnership (LLP)**
☐ **A partner in a partnership**
☐ **An officer, director, or managing executive of a corporation**
☐ **An owner of at least 5% of the voting or equity securities of a corporation**

83.    In response to Question No. 23 of the SOFA the Debtor answers "No. None of

the above applies". *See* Main Case Docket No. 16.

21

- • Trustee's Response: Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report. By way of example, Mind Gamz and KBWB are not listed nor is Atrium Health Group.

**The Inconsistent Testimony of the Debtors at the 341 Meeting**

84.    Based upon further information and belief, at the 341 Meeting, under questioning

by the Trustee, the Debtors claimed the following notable points:

- • The Debtors confirmed their signatures to the Petition, they had an opportunity to review the Petition, and confirmed the accuracy of the information in the Petition.

  - o Trustee's Response: The testimony of the Debtors at the 341 Meeting was under oath. The Debtors confirmed they signed the Petition noting they each "have examined this petition, and I declare under penalty of perjury that the information provided is true and correct". The Debtors have filed no amendments to their Petition.

- • The home they reside in is a rental property paid for by the Debtor's Father who resides at the property.

  - o Trustee's Response: Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report. By way of example, the Debtors appear to claim the Debtor's Father supports the Debtors. However, the payments from the Mind Gamz account(s) to the Debtor's Father appear to reflect more funds being transferred to the Debtor's Father than the Debtor's Father paid to the Debtors/Mind Gamz.

- • The Debtors claim no personal income.

- • Elia claims he has not had personal income since 2014.

- • Mariana claimed to have no job.

- • The Debtors sources of monthly income come from the Debtor's Father and is given as a gift. The Debtors claim to not know the income source of these gifts which in in the form of cash transfers.

  - o Trustee's Response: As noted above, based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report. By way of example, Mind Gamz that received approximately $2,900,000 that appears was mostly due to Elia but transferred to Mind Gamz. The Debtors

also appear to claim the Debtor's Father supports the Debtors.   However, the payments from the Mind Gamz account(s) to the Debtor's Father appear to reflect more funds being transferred to the Debtor's Father than the Debtor's Father paid to the Debtors/Mind Gamz.

- o *Additionally, based upon information and belief, on March 25, 2019, just ten (10) days after the 341 Meeting where Elia testified he has not had personal income since 2014, which is consistent with the zero income since 2017 the Debtors claim on their Petition - Mind Gamz in just one deposit received $100,000. Mind Gamz also received $12,600 from a PayPal account on April 10, 2019, and $80,000 from an unknown source on April 15, 2019.*

- Elia claims to have no credit cards and/or any other forms of credit.

  - o <u>Trustee's Response</u>:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, the Debtors/Mind Gamz appear to have made approximately $600,000 in credit card payments in the four (4) years prior to the Petition Date through the Mind Gamz account(s) and both American Express Centurion Bank and Citicard and/or their affiliates filed proofs of claim in these proceedings.

- The Debtors claim to own no jewelry.

- The Debtors claim to own no furniture, paintings, collectables or art.

- The Debtors claims that beginning in 2009 when their financial issues first began when their assets were sold off.  The problems allegedly occurred due to a down turn in the nursing home(s)/health business Elia owns.

  - o <u>Trustee's Response</u>:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.   By way of example, the Debtors/Mind Gamz appear to have made approximately $600,000 in credit card payments in the four (4) years prior to the Petition Date through the Mind Gamz account(s).  Additionally, the size of the Colts Neck Estate would likely require some furnishings.   Moreover, despite the Debtors claiming to have lost all the trappings of wealth – the transfers in and out of the Mind Gamz account are not consistent with the Debtors' testimony.

- The Debtor notes "KBWB" was/is the holding company of the nursing homes and any other companies owner are not holding companies but essentially affiliates of KBWB.

- Debtors claimed Elia's businesses became unviable in April of 2018.

23

- The Debtors claimed the only business interests they hold were in the nursing homes which was looking to be sold for $1 to help remove the personal obligations of the owners of the business as the company had approximately $300 million in debt and was worth only approximately $120 million dollars.

- The Debtors claim they never paid any business debtor for which they were not personally liable.

  o Trustee's Response: As noted above, based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report. By way of example, Mind Gamz received approximately $2,900,000, which appears to have been mostly due to Elia but transferred and/or diverted to Mind Gamz. The Debtors also appear to claim the Debtor's Father supports the Debtors. Indeed, Mind Gamz received approximately $2 million from KBWB, an entity in which the Petition indicates the Debtors own a 20% interest. Several of the wire receipts provided by Valley Bank had memos indicating that the receipts were distributions all within the four (4) years prior to the Petition Date.

- Debtors claim to not own/lease a vehicle but rather use a vehicle leased by the Debtor's Father and the Elia noted he has not made any payments toward that vehicle.

  o Trustee's Response: As noted above, based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report. By way of example, within the four (4) years prior to the Petition Date Mind Gamz made payments to "Mercedes Benz Financial Services" and "Porsche".

- The Debtors claim only the bank accounts listed in the Petition are the only current bank accounts of the Debtors as of the time of the 341 Meeting and the four (4) years prior to the Petition Date.

- Debtors claim to have closed no joint bank and/or investment accounts in the four (4) years prior to the Petition Date.

- The Debtors claim to hold no funds outside the United States.

- The Debtors claim no one owes them any money.

- The Debtors claim no one is holding any property for their benefit.

- The Debtors claim no investment accounts.

- Elia notes he has a PayPal account but no funds are in it.

- Elia notes in 2014 the IRS swept his accounts in 2014 following his answer that no funds were in his PayPal account.

  o Trustee's Response: As noted above, based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report. By way of example, the account(s) placed in the name of Mind Gamz (which appear to be used almost completely as the Debtors personal account(s)) are not disclosed in the Petition. Moreover, approximately $73,000 has been transferred to Charles Schwab. Additionally, since the IRS placed a lien on the Debtors' accounts and swept them, the Debtors diverted approximately $2.9 million dollars in funds that mostly belonged to Elia to the Mind Gamz accounts in the past four (4) years, and used the Mind Gamz account(s) for what appears to be largely personal purposes.

- ***Elia notes that Mind Gamz was a company started to do apps but it never made any money or did anything.***

- The Debtors note they did not transfer any real or person property to any insiders or third parties in the four (4) years prior to the Petition Date that was valued over $5,000.

  - Trustee's Response: Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report. By way of example, transfers from the Mind Gamz account(s) include the following approximate transfers to apparent insiders: $73,500 to Chris Zois, $165,500 to Christ Zois, and $12,500 to Joelle Zois. Moreover, as the Debtors claim they live with the Debtor's Father it is also possible they were paying many of the daily living expenses of the Debtor's Father and the Debtor's mother. Furthermore, the Debtors did not disclose their interest in Mind Gamz, which received approximately $2,900,000 that appears to have been mostly due to Elia but was transferred or diverted to Mind Gamz. Additionally, Mind Gamz appears to have received from and/or transferred funds to accounts with PayPal and Venmo and the Debtors appears to confirm the existence of such accounts at the 341 Meeting but further appeared to claim the accounts have no funds. No accounts with PayPal and Venmo are listed on the Petition. Finally, Elia's assertion that Mind Gamz made no money is contradicted by $2.9 million in deposits, of which Valley Bank's wire receipts and check image deposits indicated nearly $600,000 was paid to Mind Gamz's benefit.

- Debtor claims a private jet he owned was sold by creditors and he never even saw the plane.

- Debtors claim minimal items sold through consignment.

- The Debtor claims to have sold some small "tchotchke" items where the Debtors got about $8,000 to $10,000 in the past year.

  - Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, Mind Gamz received three deposits from "Bauman Rare Books Inc.", including deposits within the two (2) years prior to the Petition Date totaling about $57,000 with one deposit being made on February 20, 2019 in the amount of $21,700.  The Notation with the deposits indicated "For Catcher Rye", "Goldfinger" and "Casino Royale".

- Both the Debtors children go to St. Luke's private school.  The Debtors claim the Debtor's Father pays the tuition for the Debtors' children.

  - Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  By way of example, Mind Gamz paid St. Luke's (the private school where the Debtors' two children attend) approximately $71,000 in just 2017 and 2018, and about $10,000 paid post-petition.

- Elia claims to have no current life insurance policies.

  - Trustee's Response:  Based upon information and belief and as noted in the Bederson Report this answer by the Debtors appears inconsistent with the information with the facts and the Bederson Report.  Specifically, Mind Gamz made the approximate payment: $45,000 to Lincoln National Life Insurance, $34,000 to Prudential Insurance, and $8,000 to TransAmerica Insurance.

85.    Based upon information and belief, Elia provided much of the testimony at the 341 Meeting but at no point did Mariana appear to substantively disagree with Elia.

86.    The Bederson Reports also reflects that Mind Gamz received deposits from and made payments to three individuals: Brian Saltzman, Michael Weinstein, and William Zeckendorf.  The documentation provided by Valley Bank appears to indicate that the transactions with these individuals were for loans.  It is unclear whether these transactions are for loans payable or loans receivable.  However, these transactions with these individuals were not listed on the Petition as either assets or liabilities of the Debtors' estates.

**Lack of Compliance by the Debtors to the Trustee's Request for Information**

87.    On or around February 25, 2019, the Trustee sent a request (the "Trustee's Request") for certain documents and information of the Debtors that included, among other things: tax returns for the Debtors and any businesses they own more than 1% of the business; copies of any bank and/or investment accounts the Debtors have/had an interest in within the approximately four (4) years prior to the Petition Date; a schedule of all business the Debtors have/had an interest in within the approximately four (4) years prior to the Petition Date; information on any transfers made to or for the benefit of any third parties made by the Debtors in the aggregate of $5,000 in within the approximately four (4) years prior to the Petition Date.

88.    Based upon information and belief, the Debtors did not provide all the requested information and documents in the Trustee's Request.    Moreover, the Debtors did not provide information related to Mind Gamz or most of the information related to the findings of the Bederson Report.

89.    Based upon information and belief, there are various outstanding questions as to transfers to insider and/or third parties, potential undisclosed/under-disclosed assets, and the actual legitimate creditor body of the estates.

90.    The Debtors' failure to cooperate with the Trustee is frustrating the Trustee's efforts to conduct an orderly liquidation of the estates' assets for the benefit of the entire creditor body.

## COUNT ONE

91.     The Plaintiff repeats and realleges each and every allegation contained above as if set forth at length herein.

92.     Pursuant to section 727(a)(2)(B) of the Bankruptcy Code, a debtor should be denied a discharge when, after the date of the filing of the petition, he/she transfers, removes, destroys, conceals, or mutilates his/her property with the intent to hinder, delay, or defraud a creditor or an officer of the estate.

93.     The Debtors concealed the full nature of certain property of the estates from their creditors and the Plaintiff after the Petition Date.

94.     Accordingly, the Defendants' discharge should be denied under section 727(a)(2)(B) of the Bankruptcy Code.  Pursuant to section 727(c)(1) of the Bankruptcy Code, the Trustee may object to the granting of a discharge under section 727(a) of the Bankruptcy Code.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants as follows:

a.      For an order denying the Defendants' discharge, pursuant to section 727(a)(2)(B) of the Bankruptcy Code; and

b.      For such other and further relief as this Court deems just, proper, and equitable.

## COUNT TWO

95.     The Plaintiff repeats and realleges each and every allegation contained above as if set forth at length herein.

96.     Pursuant to section 727(a)(3) of the Bankruptcy Code, a debtor may be denied a discharge if he/she conceals, destroys, mutilates, falsifies, or fails to keep any recorded information from which the debtor's financial condition or business transactions may be ascertained.

97.    The Defendants have failed to provide a reasonable explanation for failing to properly disclose certain property, upon information and belief, have intentionally concealed, falsified and/or failed to keep information from which the Debtors' financial condition and/or business transactions may be ascertained.

98.    Hence, the Defendants should be denied a discharge pursuant to section 727(a)(3) of the Bankruptcy Code.  Pursuant to section 727(c)(1) of the Bankruptcy Code, the Trustee may object to the granting of a discharge under section 727(a) of the Bankruptcy Code.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants as follows:

a.    For an order denying the Defendants' discharge pursuant to section 727(a)(3) of the Bankruptcy Code; and

b.    For such other and further relief as this Court deems just, proper and equitable.

<u>**COUNT THREE**</u>

99.    The Plaintiff repeats and realleges each and every allegation contained above as if set forth at length herein.

100.    Pursuant to section 727(a)(4) of the Bankruptcy Code, a debtor may be denied a discharge if he/she knowingly and fraudulently, in or connection with the case –

(A)    made a false oath or account;
(B)    presented or used a false claim;
(C)    gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting for forbearing to act; or
(D)    withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

101.    In the instant case, the Defendants have concealed or failed to properly keep or preserve recorded information, including, books, documents, records and papers from which the

Defendants' financial condition and business transactions can be determined, specifically as it relates to certain potential assets and liabilities.

102.    Hence, the Defendants should be denied a discharge pursuant to section 727(a)(4) of the Bankruptcy Code.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants as follows:

a.    For an order denying the Defendants' discharge, pursuant to section 727(a)(4) of the Bankruptcy Code; and

b.    For such other and further relief as this Court deems just, proper, and equitable.

## COUNT FOUR

103.    The Plaintiff repeats and realleges each and every allegation contained above as if set forth at length herein.

104.    Pursuant to section 727(a)(5) of the Bankruptcy Code, a debtor may be denied a discharge if he/she fails to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

105.    In this case, the Defendants have failed to satisfactorily explain a loss of assets or deficiency of assets.

106.    Hence, the Defendants should be denied a discharge pursuant to section 727(a)(5) of the Bankruptcy Code.

**WHEREFORE,** the Plaintiff demands judgment against the Defendants as follows:

a.    For an order denying the Defendants' discharge, pursuant to section 727(a)(5) of the Bankruptcy Code; and

b.    For such other and further relief as this Court deems just, proper and equitable.

## COUNT FIVE

107.    The Plaintiff repeats and realleges each and every allegation contained above as if set forth at length herein.

108.    The Plaintiff has incurred significant legal expenses in order to pursue the claims against the Defendants.

109.    The Plaintiff is entitled to recover reasonable attorneys' fees, pursuant to Fed. R. Bankr. P. 7008 and 7054.

**WHEREFORE**, the Plaintiff demands judgment against the Defendants as follows:

(a)    For an Order allowing the Trustee to seek reasonable compensation for attorneys' fees incurred in pursing the within relief, pursuant to Fed. R. Bankr. P. 7008 and 7054; and

(b)    For damages, together with interest, and costs of suit; and

(c)    For such other and further relief as this Court deems just, proper, and equitable.

## COUNT SIX

110.    The Trustee repeats and realleges each and every allegation contained above as if set forth at length herein.

111.    The Trustee hereby expressly reserves his right to (i) commence any and all other causes of action that he may maintain on behalf of the estates against the Defendants, by amending this Complaint or by separate action, (ii) amend this Complaint, and (iii) assert any available objections to any claims that the Defendants may have against the estates.

**WHEREFORE,** the Trustee demands judgment in his favor and against the Defendants, as follows:

(a)    granting the relief as more fully set forth herein; and

(b)    granting such other relief that this Court deems just, proper, and equitable.

**McDonnell Crowley, LLC**
*Counsel for John M. McDonnell,*
*Chapter 7 Trustee/Plaintiff*

By:___*/s/ Brian T. Crowley*_____
                 BRIAN T. CROWLEY

DATED:  August 2, 2019

### VERIFICATION PURSUANT TO 28 U.S.C. § 1746

I, **John M. McDonnell**, hereby verify that the foregoing statements are true and correct

to the best of my knowledge and belief.


DATED: August 2, 2019                                                          _____ */s/ John M. McDonnell* _____
                                                                              JOHN M. MCDONNELL

# Exhibit "A"



**BEDERSON** LLP

*Accountants and Advisors since 1937*

---

<u>VIA EMAIL & REG. MAIL</u>

July 30, 2019

Brian T. Crowley, Esq.
McDonnell Crowley, LLC
115 Maple Avenue, Suite 201
Red Bank, NJ 07701

<u>Re: Zois, Elia & Mariana - Preliminary Mind Gamz Findings</u>

Dear Brian:

Pursuant to your request, we reviewed several hundred pages of bank records for the non-Debtor related entity Mind Gamz LLC, for the purpose of providing you with a preliminary overview of inconsistencies on the Debtors' Petition and instances where the Debtor may have diverted assets. The bank account we reviewed is domiciled at Valley National Bank ("VNB") and its account number is #█████7544.

Our procedures included reviewing the Debtor's available statements, check images and deposits and segregating payments and deposits over $1,000 for further investigation. Our deposits analyses identify and are summarized by both the sources and the intended beneficiaries of the funds, to assist you with determining instances where funds belonging to the Debtors were diverted to Mind Gamz. Sources of deposits were determined by reviewing VNB's wire receipts and deposit tickets, which either provided the deposits' originator or a corresponding check from the payer, respectively. Beneficiaries were determined by VNB's wire receipts (which disclosed the intended beneficiary of most wires) and/or by reviewing the payees of deposited checks. We also reviewed the Debtors' personal income tax returns from 2014 through 2017. Based on the available information, we prepared the following analyses:

- **Exhibit A**: Schedule of Deposits during the Four-Year Period totaling $2,889,755

- **Exhibit B**: Schedule of Post-Petition Deposits Received After the February 6, 2019 Chapter 7 Filing Date totaling $201,590

- **Exhibit C**: Schedule of Possible Insider Payments and Other Significant Disbursements during the Four-Year Period totaling $2,763,795

- **Exhibit D**: Schedule of Post-Petition Payments Made After the February 6, 2019 Chapter 7 Filing Date totaling $186,554

Accounting, Auditing & Tax – 100 Passaic Avenue, Fairfield, New Jersey 07004
Insolvency & Litigation – 347 Mt. Pleasant Avenue, Suite 200, West Orange, New Jersey 07052
973.736.3333 • www.bederson.com

Brian T. Crowley, Esq.
Re: Zois, Elia & Mariana - Preliminary Mind Gamz Findings
Page 2

Based on our analyses, the following summarizes our preliminary findings:

1. Unreported Deposits – Mind Gamz received $2.9 million in deposits during the four year period. Mind Gamz's existence was not disclosed on the Petition, nor was its activity reported on the Debtor's personal income tax returns. The omission of Mind Gamz's activity from the Debtor's tax returns may indicate that they were fraudulently prepared.

2. Receipts from KBWB Operations ("KBWB") – Mind Gamz received $2.0 million from KBWB Operations, an entity in which the Petition indicates the Debtors own a 20% interest, but the value of this interest is reported as "Unknown". Several of the wire receipts provided by VNB had memos indicating that the receipts were distributions. An entity that has the ability to distribute $2.0 million to its Members most likely has more than a nominal or unknown value, so the Petition's lack of assigning a value to KBWB appears to be misleading. Copies of KBWB's most recent four year's income tax returns, financial statements, and accounting records should be provided so that we can determine its value to the Estate.

3. Elia Zois was the Beneficiary of Most of Mind Gamz Deposits – Exhibit A includes summaries that sort by both the Source of the deposit, and the intended Beneficiary of the deposit. We noted that of the $2.9 million deposited, Elia Zois was the beneficiary of nearly $2.1 million, not Mind Gamz.

4. Unknown Deposits – There were approximately $50k in deposits from an unknown account ending in #7228, and $82k in cash deposits for which we cannot determine the source. All of the cash deposits were for even round dollar amount under $10,000. The Debtors should provide explanations and documentation to support the purpose and source of these deposits, as they indicate the existence of an undisclosed source of substantial funds.

5. Post-Petition Deposits – Mind Gamz received over $200k in post-petition deposits for which the sources and beneficiaries can't be determined because VNB did not provide deposit tickets and wire transfer receipts. One of the deposits was for $100k on 3/25/19, and another was for $80k on 4/15/19. The Debtors Petition appears to be misleading because it states that the Debtors have no current source of income, yet in the three months after filing it appears as if Mind Gamz received $200k and the Debtors then used those funds to pay personal expenses. If any of these post-petition deposits were pre-petition earnings that belonged to the Debtor, they should be recoverable by the Estate.

6. Possible Undisclosed Accounts – We observed several deposits from and/or payments to PayPal, Venmo, and Charles Schwab. The Petition does not disclose any accounts at these institutions.



Brian T. Crowley, Esq.
Re: Zois, Elia & Mariana - Preliminary Mind Gamz Findings
Page 3

7. <u>Loans with Unknown Individuals</u> – We observed several deposits from and/or payments to Brian Saltzman, Michael Weinsten, and William Zeckendorf. Several of these transactions had memos indicating they were loans, but we cannot determine whether they represent loans payable or loans receivable, and none of these individuals were disclosed on the Petition. If the transactions were/are loans payable, they should be disclosed as creditors. If they are loans receivable, they should be disclosed as assets and are potentially recoverable by the Estate.

8. <u>Payments Appear to have been made for Personal Expenses</u> – Several of Mind Gamz's payments were for children's education, credit cards, utilities, vehicles, insurance, and other purposes that appeared to have been personal in nature. Since the Debtors' personal bank records obtained from Bank of American and Wells Fargo had little to no activity, we question whether Mind Gamz was being used as the Debtors' alter ego. The existence of credit cards appears to contradict the Debtors' 341 hearing testimony in which they claimed to have no credit cards.

9. <u>Payments to Certain Entities</u> – Mind Gamz paid $147k to 8D Property Holdings LLC and $12k to GC Services Ltd Partnership. We cannot determine the Debtors' relationship with these entities, whether they are insiders, or whether the payments were investments of some type that may have value to the Estate.

10. <u>Mind Gamz made Several Payments to Relatives</u> – Mind Gamz paid Chris Zois ($73.5k) Christ Zois ($165.5k), and Joelle Zois ($12.5k). Since most of the deposits to Mind Gamz were intended for the Debtors, and the Debtors then used those deposits to send funds to relatives, we question whether any of the payments to relatives are recoverable. In addition, the existence of these payments appears to contradict the Debtors' 341 hearing testimony that no property over $5k was transferred to insiders during the four-year period.

11. <u>The Debtors were paid Several Hundreds of Thousands of Dollars</u> – We observed payments to cash ($25k), Elia Zois ($796k), and Mariana Zois ($24k). All of these payments were for even round dollar amounts, and with the exception of one, the payments were all under $10k. We cannot determine to where these funds were deposited, or if the Debtors took the funds in cash (which is possible because there are no corresponding deposits in the Debtors' available personal bank records), but the Debtors need to provide explanations and documentation supporting how these funds were used. We also reiterate that the Debtors' personal income tax returns report no income from Mind Gamz.



Brian T. Crowley, Esq.
Re: Zois, Elia & Mariana - Preliminary Mind Gamz Findings
Page 4

12. <u>Payments to Insurance Companies</u> – Mind Gamz paid Lincoln National Life Insurance ($45k), Prudential Insurance ($34k), and TransAmerica Insurance ($8k). We also observed a few pages of a policy at Travelers in the Debtors records. Copies of policies and recent statements should be provided to determine if there was any life insurance with cash surrender values, or there were insured assets that were not disclosed on the Petition. We note that the Petition did not disclose any life insurance policies.

13. <u>Unknown Payees</u> – There were several payments to unknown payees, including a transfer to an unknown account ending in #7835 (which could be an undisclosed account), and multiple withdrawals for which VNB did not provide a payee or withdrawal ticket. The Debtors and/or VNB should provide the necessary documentation to enable us to determine the payees.

14. <u>Payments to Valley National</u> – We observed nearly $78k in payments to VNB. Since VNB was not listed on the Petition as a creditor, we cannot determine if these payments were on an undisclosed loan, or to purchase bank checks to other payees.

15. <u>Payments to St. Luke's</u> – Mind Gamz paid $71k during 2017 and 2018, and $10k during the post-petition period, to St. Luke's for their children's tuition. These payments appear to contradict the Debtors' 341 hearing testimony that the father paid St. Luke's.

16. <u>Post-Petition Withdrawals</u> – As previously discussed, the Debtors appeared to continue using Mind Gamz to pay personal expenses after the filing. We observed $14k paid to Charles Schwab (which could be an undisclosed account), various payments for education, and $60k in withdrawals to unknown payees. If the unknown withdrawals represent funds taken by the Debtors, we cannot determine how the funds were used. We reiterate that the Petition indicates that the Debtors had no monthly income. Furthermore, if the Debtors have an account at Charles Schwab, it would contradict their 341 hearing testimony that they had no investment accounts.

17. <u>The Petition Discloses Minimal Assets</u> – As you previously mentioned, the Debtors live in a multi-million dollar house but listed minimal amounts for furniture, household goods, jewelry and collectible. We question the accuracy of these disclosures given the Debtors financial wherewithal and suggest inspection of the Debtors home.

18. <u>Personal Income Tax Return</u> – We noted the following from our review of the Debtors' 2017 Form 1040:

   a. The Debtors 2017 Form 1040 indicates no income. This appears to be incorrect given all of the distributions from KBWB, and all of the funds paid to the Debtors by Mind Gamz during 2017.
   b. Schedule A of the 2017 Form 1040 indicates that $287k in real estate taxes were paid. We cannot determine from what account these taxes were paid, but the Debtor should provide a schedule of all properties they own on which they paid real estate taxes. If the Debtor's father owns the house in which the Debtors reside (as they testified at the 341 hearing), we question why they would be paying the real estate taxes.

Brian T. Crowley, Esq.
Re: Zois, Elia & Mariana - Preliminary Mind Gamz Findings
Page 5

    c.  The tax return indicates that $498,602 in investment interest was paid to Summit Bridge, which is included on the Petition as a creditor, but we cannot determine from what account this interest was paid. Supporting documentation should be provided to determine the nature of the Debtors relationship with Summit Bridge, whether the Debtors have any accounts there, and from where these funds were paid.

    d.  Copies of the Debtors 2018 Federal and State income tax returns were not provided, but should be produced as soon as the returns are filed.

After you have had the opportunity to review this information, we recommend a conference call to discuss how you would like us to proceed in this matter.

Very truly yours,

BEDERSON LLP

Timothy J. King
Partner

TJK:mmp
Enc.
CC:   John M. McDonnell, Esq., Trustee (via email)
      Christopher L. Phillipps (via email)
      Rubaiyat Abedin (via email)

E:\Zois Elia and Mariana\Correspondence\Outgoing\2019.07.30 Preliminary Mind Gamz Findings



# Exhibit "B"

# Palm Beach Daily News

UPDATED: Oceanfront house in Estate Section sells for $8.5 million | Palm Beach Daily News - Palm Beach, FL

Business

## UPDATED: Oceanfront house in Estate Section sells for $8.5 million

**By Darrell Hofheinz**
Posted May 17, 2018 at 12:01 AM
Updated May 17, 2018 at 8:21 PM

Filmmaker and businessman Elia Zois and his wife, Mariana, have sold, for a recorded $8.5 million, the five-bedroom oceanfront house he bought for $5 million in 2002 at 870 South Ocean Blvd.

The buyer is a Florida limited liability company named Invest Komfort FL LLC, according to the deed recorded today by the Palm Beach County Clerk's office. The entity is managed by businessman Piotr Krotoszynski of West Palm Beach, according to state business records.

The buyer took out a $5.1 million mortgage on the property, according to a document recorded today. The related loan with Palm Beach Community Bank matures in April 2018, the document shows.

Facing about 100 feet of oceanfront across the coastal road, the Mediterranean-style house was built in 1986 and later renovated. The two-story residence has 7,154 square feet of living space, inside and out, property records show. The property is at the corner of Via Vizcaya, three houses north of the intersection of South County Road and South Ocean Boulevard.

7/30/2019    Case 19-02076-KCF    Doc 1-1 Filed 08/02/19 al Entered 08/02/19 19:46:32 Desc Palm Beach, FL
Exhibit A    B    C and D    Page 9 of 20

The house was priced at $9.2 million by listing agent Liza Pulitzer of Brown
Harris Stevens. It stands on a lot measuring about four-tenths of an acre in the
Estate Section.

Pulitzer's sales listing said the house could make way for "a 7,000 square foot
dream house with amazing views" and a private cabana on its beach parcel. But
several sources familiar with the deal said the new owner plans to remodel the
house.

"We were delighted with the sale," Pulitzer said, but declined to discuss specifics
of the deal or the parties involved.

Agent Janina "Asha" Radtke of Sotheby's International Realty handled the buyer's
side of the transaction.

The house had been on and off the market for several years with other agencies.
Pulitzer acquired the listing in late October, according to the Palm Beach Board
of Realtors Multiple Listing Service.

Previous sales identified the house as having been "masterfully renovated" and
noted its high ceilings and marble and parquet floors. In 2005, at the height of
the real estate boom, the property had been listed furnished at $17 million.

With ties to New Jersey and New York City, Zois had the house homesteaded in
the Palm Beach County tax rolls.

Elia Zois has invested in nursing homes, public records show. He also directed
the independent film *Jersey Guy,* released in 2003 with a script he co-wrote with
his father, psychiatrist Dr. Christ L. Zois.

# Exhibit "C"

# FBI agents, other feds descend on two N.J. rehab facilities as company plans to acquire them

Updated Apr 25, 2019;
Posted Apr 25, 2019



Ribbon cutting ceremony for the Atrium Post Acute Care of Woodbury, Tuesday, April 19, 2016. (Stephanie Maksin | For NJ Advance Media)

4

917 shares

By Rebecca Everett | For NJ.com

FBI agents descended on two locations of Atrium Health &
Senior Living, a company that operates rehabilitation facilities
all over New Jersey.

Carrie Adamowski, spokeswoman for the FBI's Philadelphia
office, said she could only confirm that personnel were at Atrium
Post Acute Care of Woodbury Wednesday "carrying out court-
authorized law enforcement activity."

The company that is taking over Atrium facilities, Spring Hills
Senior Communities, told NJ Advance Media that investigators
from "several federal agencies" were at the Woodbury rehab
center as well as Atrium's headquarters in Little Falls.

"These investigations relate entirely to actions or inactions of
prior Atrium management. These investigations have no
adverse impact on the delivery of care to the residents,"

Christina O'Leary, a spokeswoman for Spring Hills, said Thursday.

Atrium Health & Senior Living has been in financial trouble, according to reports. WSAW-TV in Wisconsin reported Atrium owed $13.5 million to its lenders there and when it couldn't pay, all of its facilities in Wisconsin and one in Michigan went into receivership in 2018. Four closed earlier this year, WSAW-TV reported.

Last fall, U.S. Foods Inc., which provided food for Atrium facilities, sued various corporations run by Atrium Co-CEO Kevin P. Breslin for over $2.2 million in alleged unpaid bills. U.S. Foods Inc. said in the New Jersey federal court filing that it was forced to stop all food deliveries to the facilities in October due to nonpayment.

Messages left for Atrium's head of operations and the administrator of the Woodbury location were not returned Thursday.

O'Leary said Spring Hills Senior Communities in Edison is in the process of acquiring all of Atrium's New Jersey facilities (in Wayne, Princeton, Matawan, Livingston, Hamilton and Woodbury) with the exception of its location in Lawrenceville.

"In that capacity, Spring Hills has been retained to manage the facilities and has been diligently working to resolve all prior outstanding issues," she said. She did not give more details on what the outstanding issues were.

The facility in Woodbury opened in 2016, the culmination of a city-endorsed redevelopment plan to find a new use for the closed Woodbury Country Club and the surrounding acreage.

Burris Construction Co., which shares top brass with Atrium, completed the renovation, according to previous reports. It transformed the club into a rehabilitation facility boasting a pub, bistro, movie theater, private rooms and beautiful grounds, according to its website.

Records show the property is still owned by Burris Post Acute Network Woodbury, based in Little Falls. Calls to the headquarters of Burris Construction Co. were not returned Thursday.

 Atrium Health unveils new care center at former Woodbury Country Club

All was chummy between city officials and Burris in the three years leading up to the facility's opening in 2016. But a year later, the city passed a resolution finding Burris Post Acute Network Woodbury had defaulted on their redevelopment agreement by, among other things, failing to timely pay the city $357,730 under a payment in lieu of taxes (PILOT) agreement and failing to pay some taxes and fees.

In June, the city listed Burris properties, including the rehab center and the surrounding residential properties, on its list of properties that could be auctioned for nonpayment of taxes for 2017. Burris owned more than $78,000 in total.

It's not clear if the corporation has since made the payments, but it still owns the property according to municipal records.

Calls and emails to the city's mayor, administrator and treasurer were not returned.

Rebecca Everett may be reached at reverett@njadvancemedia.com. Follow her on Twitter @rebeccajeverett. Find NJ.com on Facebook.

# Exhibit "D"



Colts Neck, NJ

< 07722 Homes for Sale                                    Similar Homes >



## 88 Montrose Rd
Colts Neck, NJ 07722

⌂ DELISTED

**$8,995,000**  7 Bd  10.3 Ba  14,000 Sqft  $643/Sqft

| | | | |
|---|---|---|---|
| 60 | Map | Share | Save |
| Photos | | | |

| | |
|---|---|
| Home Value Estimate ❓ | $4,802,000 ($343/Sqft) |
| Property Type | Single Family |
| ZIP Code | 07722 |
| County | Monmouth |
| Lot Acres | 38.00 |
| HOA Fees | $0 |
| Year Built | 2009 |
| Mortgage Payment | $35,400/Month |

Get Your Personalized Mortgage Payment Now

Welcome to "Windy Hill" Farm one of New Jersey's Finest Estates. This 38 acre private estate is sited atop "Windy Hill" and overlooks a private lake while bordering Bucks Mill park. The Estate was designed by Cathy Zukerman and built by Jim Lukowitz as culmination of the sellers desire to create a French Chateau which embodies old world character and charm while offering the highest level of quality, modern conveniences and attention to detail. From its full stone facade (which took over 2 years to complete) to its staggered slate roof and French Roasted Oak Floors, the attention to detail is evident in the fine details of each room. The design offers the perfect balance of form and function whether it is for entertaining large parties or intimate gatherings.

Louis J Critelli of Engel & Volkers-Critelli Properties